**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

DAVID LOCKTON AND KATHY LOCKTON AS TRUSTEES OF THE LOCKTON FAMILY TRUST 2019, C. GORDON WADE, DAVID P. HANLON, BARTLEY FRITZSCHE, RICHARD A. LOCKTON, JENNIFER BARKER, DR. FREDERICK HENDRICKS, and MARY W. MARSHALL,

    Plaintiffs,

  v.

THOMAS S. ROGERS, HANK J. RATNER, R. BRYAN JACOBOSKI, JAKE MAAS, STEVE GOODROE, and GRAHAM HOLDINGS COMPANY,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2021-0058-SG

## MEMORANDUM OPINION

Date Submitted: November 8, 2021
Date Decided: March 1, 2022

Daniel A. Griffith, of WHITEFORD, TAYLOR & PRESTON LLC, Wilmington, Delaware; OF COUNSEL: Allan B. Diamond, Jason Fulton, and John B. Sample, of DIAMOND MCCARTHY LLP, Houston, Texas, *Attorneys for the Plaintiffs*.

Stephen C. Norman, Nicholas D. Mozal, and Callan R. Jackson, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Defendants Thomas S. Rogers, Hank J. Ratner, R. Bryan Jacoboski, and Steve Goodroe*.

Albert H. Manwaring IV, Matthew F. Lintner, and Kirsten Zeberkiewicz, of MORRIS JAMES LLP, Wilmington, Delaware; OF COUSEL: Robert A. Van Kirk and Sarah F. Kirkpatrick, of WILLIAMS & CONNOLLY LLP, Washington, DC, *Attorneys for Defendants Jake Maas and Graham Holdings Company*.

**GLASSCOCK, Vice Chancellor**

Actions of corporate decision-makers, when within the bounds of fiduciary duties, are generally free from review by this Court. When, however, these fiduciaries venture outside those bounds—as when causing the company to undertake a transaction in which they are themselves interested—their actions draw stringent judicial review. The burden is upon such conflicted fiduciaries to demonstrate that the actions taken were entirely fair to the entity and its stockholders.

The Plaintiffs contend that the matter here is the quintessence of such a conflicted transaction. Holders of corporate debt and preferred equity of WinView, Inc. ("WinView" or the "Company") made up the majority of the WinView board of directors. These defendant directors allegedly caused the company to merge into other entities, transferring thereby benefits to themselves not shared with the common stockholders, who were squeezed out; with the defendants ignoring other opportunities less lucrative for themselves or their principals but better for the stockholders. The Plaintiffs here are former stockholders of WinView, who seek damages based on these allegations.

Before me are motions to dismiss the Amended Complaint. I first consider whether *Corwin* applies and requires that the case be dismissed; I find that, based at least on the factual record as it now exists, *Corwin* does not cleanse the transaction. With regard to the Defendants' Motion to Dismiss under Rule 12(b)(6), I find generally that the Amended Complaint states adequate breach of fiduciary duty

claims against the Director Defendants, as well as a claim against the Director Defendants and the largest blockholder of WinView for unjust enrichment.

I note that the Defendants maintain stoutly that their actions should be viewed based on what they allege was the insolvency of the Company and the exigencies of the situation, in light of all of which their actions complied with fiduciary duties to the creditors and equity-holders of WinView; in fact, per the Defendants, the results were quite favorable to the common stockholders. These allegations may prove dispositive upon a fuller record, but are not sufficient at this plaintiff-friendly stage of the proceedings to support a dismissal.

My analysis follows, below.

## I. BACKGROUND[1]

*A. The Parties and Relevant Non-Parties*

Non-Party WinView was a privately held Delaware corporation founded in 2009.[2] In May 2020, WinView consummated a business combination with two Canadian companies, Frankly and Torque, pursuant to which Torque would acquire all of the outstanding shares of Frankly, and WinView would merge with a wholly

---

[1] Unless otherwise noted, the facts referenced in this Memorandum Opinion are drawn from the First Amended Verified Complaint for Breach of Fiduciary Duties (referred to herein as the "Amended Complaint") and the documents incorporated therein. *See generally* First Am. Verified Compl. Breach Fiduciary Duties, Dkt. No. 49 [hereinafter the "Am. Compl."].
[2] *Id.* ¶ 18.

owned subsidiary of Torque (the "Merger"), with the final entity being renamed Engine Media Holdings, Inc. ("Engine Media").[3]

Plaintiff David Lockton is a co-founder of WinView and served as WinView's Chief Executive Officer ("CEO"), President, and Secretary from 2009 through 2017.[4]

Plaintiff Lockton Family Trust 2019 was a WinView common stockholder.[5] Plaintiffs David Lockton and Kathy Lockton, a co-founder of WinView, served as trustees of the Lockton Family Trust 2019.[6]

Plaintiff C. Gordon Wade is a co-founder and former member of the Winview board of directors (the "Board").[7] Wade held WinView common stock at the time of the Merger.[8]

Plaintiff David P. Hanlon is a former member of the WinView Advisory Board.[9] Hanlon held WinView common stock at the time of the Merger.[10]

Plaintiff Bartley Fritzsche is a former WinView director.[11] Fritzsche held WinView common stock at the time of the Merger.[12]

---

[3] *Id.* ¶¶ 77, 165.
[4] *Id.* ¶ 1.
[5] *Id.* ¶ 2.
[6] *Id.* ¶¶ 2, 18.
[7] *Id.* ¶ 3.
[8] *Id.* ¶¶ 3, 18.
[9] *Id.* ¶ 4.
[10] *Id.*
[11] *Id.* ¶ 7.
[12] *Id.*

Plaintiffs Richard A. Lockton, Jennifer Barker, Mary W. Marshall, and Dr. Frederick Hendricks are former WinView common stockholders.[13] Each held WinView common stock at the time of the Merger.[14]

Defendant Thomas S. Rogers was the Executive Chairman of WinView and the Chairman of the Frankly board of directors prior to the Merger.[15] At the time of the Merger, Rogers held secured debt and preferred stock in WinView, and warrants on WinView's common and preferred stock.[16] Rogers also held common shares and "restricted share units" in Frankly.[17] As a result of the Merger, Rogers became the Executive Chairman of Engine Media.[18]

Defendant Hank J. Ratner was a WinView director prior to the Merger.[19] At the time of the Merger, Ratner held secured debt and preferred stock in WinView, and warrants on WinView's common and preferred stock.[20] Following the Merger, Ratner became a member of the Engine Media board of directors.[21] Ratner was a member of the special committee of WinView's Board formed to facilitate the Merger process (the "Special Committee").[22]

---

[13] *Id.* ¶¶ 5–6, 8–9.
[14] *Id.*
[15] *Id.* ¶ 10.
[16] *Id.* ¶ 85.
[17] *Id.* ¶ 10.
[18] *Id.*
[19] *Id.* ¶ 11.
[20] *Id.* ¶ 85.
[21] *Id.* ¶ 11.
[22] *Id.* ¶ 120.

Defendant R. Bryan Jacoboski was a WinView director prior to the Merger.[23] At the time of the Merger, Jacoboski held secured debt and warrants on WinView's common and preferred stock.[24] Jacoboski served on the WinView Board as a representative for Abingdon Capital Management, Ltd.[25] Jacoboski was a member of the Special Committee.[26]

Defendant Jake Maas was a WinView director prior to the Merger.[27] Maas served on the WinView Board as a representative of WinView's Series B Preferred Stockholders.[28] Maas served as the Chairman of the Special Committee.[29] Maas was also an "agent" of Graham Holdings Company, discussed below.[30]

Defendant Graham Holdings Company ("Graham") is a Delaware corporation.[31] Graham held 83% of WinView Series B Preferred Stock and was WinView's largest stockholder.[32] At the time of the Merger, Graham held secured debt and preferred stock in WinView, and warrants on WinView's common and preferred stock.[33]

---

[23] *Id.* ¶ 12.
[24] *Id.* ¶ 85.
[25] *Id.* ¶ 12.
[26] *Id.* ¶ 120.
[27] *Id.* ¶ 13.
[28] *Id.*
[29] *Id.* ¶¶ 13, 121.
[30] *Id.* ¶ 13.
[31] *Id.* ¶ 14.
[32] *Id.* ¶¶ 13–14, 98.
[33] *Id.* ¶¶ 14, 85.

Defendant Steve Goodroe was a WinView director from May 2016 until the Merger, serving as the representative of WinView's Series A Preferred Stockholders.[34] Goodroe held secured debt and preferred stock in WinView, and warrants on WinView's common and preferred stock.[35] Goodroe was a member of the Special Committee.[36]

I refer to Defendants Rogers, Ratner, Jacoboski, Maas, and Goodroe as the "Director Defendants." At the time of the Merger, the WinView Board was comprised of the Director Defendants and one additional director, Eric Vaughn, who is not named as a defendant in this action.[37]

*B. Factual Background*

WinView was founded in 2009 by David Lockton, Kathy Lockton, and C. Gordon Wade. WinView's business was focused primarily on sports betting.[38] WinView's asset portfolio was comprised largely of patents related to sports betting.[39] The Company's patent portfolio grew from nine patents upon its founding in 2009 to twenty-four patents at the close of its Series A round of financing.[40] By 2019, the Company held seventy-five patents "on the synchronized second screen

---

[34] *Id.* ¶ 15.
[35] *Id.* ¶ 85.
[36] *Id.* ¶ 120.
[37] *See id.* ¶ 156.
[38] *Id.* ¶ 18.
[39] *Id.* ¶¶ 19–20.
[40] *Id.*

6

experience, mobile sports betting, online gaming, and foundational aspects of [d]aily [f]antasy [s]ports."[41]

In January 2016, WinView undertook a Series A round of preferred equity financing.[42] Defendants Rogers, Ratner, and Jacoboski each joined WinView's Board in connection with this financing round.[43] Specifically, David Lockton approached Defendant Rogers and asked him to join WinView's Board as its Chairman in exchange for a $1 million investment.[44] Rogers agreed, on the condition that Defendant Ratner, the former CEO of Madison Square Garden, join the WinView Board as well and serve as its co-Chairman.[45] After negotiations, Rogers and Ratner ultimately joined the Board in exchange for $400,000 commitments each.[46] They also negotiated consulting agreements with WinView, pursuant to which they would earn stock options that vested at various milestones, including obtaining sponsorships, acquiring advertising contracts, and meeting certain financing targets.[47]

Meanwhile, WinView negotiated with Defendant Jacoboski to convert a convertible loan he had previously made to WinView into Series A preferred stock.[48]

---

[41] *Id.* ¶ 20.
[42] *Id.* ¶ 24.
[43] *Id.* ¶¶ 24–27.
[44] *Id.* ¶ 25.
[45] *Id.*
[46] *Id.* ¶ 26.
[47] *Id.*
[48] *Id.* ¶ 27.

7

Jacoboski agreed to this conversion on the condition that WinView amend its bylaws and certificate of incorporation (the "Charter") to provide him with a permanent seat on the Board.[49]  In September 2016, Ratner resigned as co-Chairman of WinView's Board, though he remained a director.[50]  Rogers thereafter became the Executive Chairman of the Board.[51]

### 1. WinView Undertakes a Series of Debt and Equity Financings

After completing the Series A financing round, WinView undertook five bridge loans, a Series B equity offering, and four additional debt financings.[52]  The Plaintiffs contend that the Director Defendants, some of whom participated in the financings, granted themselves generous incentive awards and securities in connection with these offerings.[53]

### a. The First Bridge Loan and the Series B Equity Offering

In late 2016, after the Series A financing round was completed, WinView raised funds through a short-term bridge loan while it worked towards a Series B equity financing round.[54]  The Amended Complaint alleges that, in November 2016,

---

[49] *Id.*
[50] *Id.* ¶ 28.
[51] *Id.*
[52] *See id.* ¶¶ 40–70, 86–91.  I discuss the bridge loans and other financings undertaken by WinView prior to the Merger to provide background on how the Defendants came to hold their warrants, secured debt and preferred stock.  To the extent that the allegations regarding these financings imply potential breaches of fiduciary duties, they would presumably be derivative claims that were lost with the Merger; at any rate, the Plaintiffs are not pursuing them here.
[53] *See id.* ¶¶ 40–70, 86–91.
[54] *See id.* ¶¶ 40–51.

8

Rogers informed the Board that he and Ratner would not invest in the bridge loan, and that he would inform potential investors that he did not plan to invest and had concerns about WinView's management.[55]   Nevertheless, Rogers and Ratner ultimately invested $200,000 each in the first bridge loan, which closed in December 2016.[56]

In exchange for their investments, Rogers and Ratner negotiated several incentives.[57]  For instance, Rogers negotiated to (i) lower the threshold for financing incentives from $50 million to $30 million, (ii) modify language that awarded him 1% of the Company's equity for signing the first license with a sports league to instead award 1% of the Company for *each* license signed, and (iii) adjust the vesting requirements for certain stock awards so that they were deemed to have been met.[58]

While the first bridge loan was closing, WinView began undertaking a Series B preferred equity financing, which closed in April 2017.[59]  WinView raised $12 million in connection with the Series B financing round, $10 million of which came from Defendant Graham.[60]  In exchange for Graham's investment, WinView agreed to amend its Charter to provide Graham a permanent representative on

---

[55] *Id.* ¶ 41.
[56] *Id.* ¶ 44.
[57] *Id.* ¶ 42.
[58] *Id.*
[59] *See, e.g., id.* ¶¶ 45, 47.
[60] *Id.* ¶ 45.

9

WinView's Board.[61] Graham assigned Defendant Maas to serve as its designated representative on the Board.[62]

### b. The Second Bridge Loan

The Amended Complaint alleges that, after WinView closed the Series B financing round, Rogers threatened to cancel meetings with potential investors unless the Board granted him and Ratner additional stock options.[63] According to the Amended Complaint, during a Board call that occurred around October 2, 2017, Rogers stated that if he were not awarded additional stock, he would cancel investor meetings, allow WinView to run out of money, and then undertake a cram-down financing.[64] Rogers also sent an email to the Board on October 3, 2017, two days before a meeting with the CEO of Comcast, stating that he had no incentive to raise funds for WinView without additional stock awards, and threatened to postpone the Comcast meeting and other investor meetings if he did not receive the awards.[65] Rogers reiterated in a series of emails on October 4, 2017 that he wanted to know whether the "incentive [was] in place" and that "[i]f need be, [he would] postpone the [meeting with Comcast's CEO]."[66] The Board then decided to grant Rogers

---

[61] *Id.*
[62] *Id.*
[63] *Id.* ¶¶ 46–52.
[64] *Id.* ¶ 48.
[65] *Id.* ¶ 49.
[66] *Id.* ¶ 50.

10

additional stock options, though the investor meetings that Rogers had threatened to scuttle did not ultimately lead to any additional investments in WinView.[67]

According to the Amended Complaint, WinView ran out of cash by January 2018, and therefore suspended payments to its suppliers.[68] As a result, WinView raised funds through a second bridge loan.[69] Around the same time, on January 1, 2018, the Board exercised a contractual option under Lockton's employment agreement to reduce his role at WinView from CEO to Chief Innovation Officer ("CIO").[70] In Lockton's place, the Board appointed a vice president of engineering, Alan Pavlish, as the "acting CEO."[71] Pavlish remained as the "acting CEO" up until the Merger, when he became an executive of Engine Media.[72]

In early 2018, the five Director Defendants met to discuss the terms of the second bridge loan without Lockton, who had proposed that the second bridge loan feature the same terms as the first.[73] Rogers later relayed to Lockton during a February 1, 2018 call that the Director Defendants required "100% warrant coverage" in order to participate,[74] meaning that the issued warrants would equal 100% of the dollar amount of their investment.

---

[67] Id. ¶ 51.
[68] Id. ¶ 52.
[69] Id. ¶¶ 53–57.
[70] Id. ¶ 32.
[71] Id. ¶¶ 32, 138.
[72] Id. ¶ 32.
[73] Id. ¶¶ 53–54.
[74] Id. ¶ 54.

11

The second bridge loan closed on March 12, 2018, with Defendants Rogers, Ratner, Jacoboski, Goodroe, and Graham participating.[75] The terms of the second bridge loan featured the 100% warrant coverage for participants, a 2x liquidation preference upon a change of control, and a conversion into Series B preferred stock.[76] The terms of the second bridge loan also featured various changes to WinView's corporate governance. For instance, Lockton was required to immediately resign from the Board, and he was replaced by Eric Vaughn as the common stockholder's Board representative.[77] WinView also amended its Charter to remove the requirement that financings and major transactions, including the sale or merger of WinView, be approved by a majority vote of each class of WinView stock.[78] As amended, the Charter required only a majority vote of all shares voting together.[79] Finally, the second bridge loan was secured by WinView's patents, and granted Jake Maas the sole power of attorney to foreclose on the patent portfolio in the event of a default.[80]

---

[75] *Id.* ¶ 57.

[76] *Id.* ¶ 55.

[77] *Id.* The Amended Complaint's allegations are inconsistent on this point. The Plaintiffs also allege that the Board designated WinView's "acting CEO," Pavlish, as the common stockholder representative. *See id.* ¶ 33.

[78] *Id.* ¶ 55; *see also id.* ¶ 33.

[79] *Id.* ¶ 55; *see also id.* ¶ 33.

[80] *Id.* ¶¶ 38, 55.

### c. The Third Bridge Loan

According to the Amended Complaint, funds from the second bridge loan ran out by August 2018.[81] Growing concerned about WinView's future, Lockton contacted MGM's CEO in late 2018 to seek capital and a "working partnership."[82] Lockton met with MGM several times, including an all-day onsite due diligence session at WinView's headquarters with MGM's Vice President of Development, who informed Lockton that he would recommend that MGM proceed further.[83]

Lockton later met with MGM executives and learned that Rogers and Ratner had approached MGM on behalf of a different mobile technology company called Tunity.[84] According to the Amended Complaint, Rogers and Ratner obtained a $12 million investment in Tunity from MGM, and they were compensated by Tunity for obtaining the investment.[85] Shortly thereafter, MGM informed Lockton that it was no longer interested in investing in WinView.[86]

With WinView's funds dwindling, WinView commenced a third bridge loan, financed by members of the WinView Board.[87] The third bridge loan closed on August 22, 2018, with Rogers and Ratner each investing $200,000.[88] In parallel with

---

[81] *Id.* ¶ 62.
[82] *Id.* ¶ 58.
[83] *Id.*
[84] *Id.* ¶ 59.
[85] *Id.*
[86] *Id.*
[87] *Id.* ¶ 63.
[88] *Id.*

the third bridge loan, Rogers directed Lockton to pursue financing by enforcing WinView's patents through patent infringement actions, with those actions being financed by patent litigation financing firms.[89]

### d. The Fourth Bridge Loan

In February 2019, Rogers determined that WinView needed to raise funds through a fourth bridge loan.[90] In a call with shareholders in March 2019, Rogers stated that if WinView was unable to raise the funds, the secured creditors, including Rogers, Ratner, Jacoboski, and Graham, intended to foreclose on WinView's patents and attempt to monetize the patents for themselves.[91] The Board then negotiated the fourth bridge loan with 6% interest, a liquidation preference, and the right to purchase warrants on WinView common stock for $0.01 per share.[92]

Following the fourth bridge loan, the Board made four additional debt offerings between March 2018 and December 2019, which the Company referred to as "non-brokered private placements."[93] Each of these debt offerings were secured by WinView's patents.[94]

---

[89] *Id.* ¶ 61.
[90] *Id.* ¶ 65.
[91] *Id.* ¶¶ 66–67.
[92] *Id.* ¶ 68.
[93] *Id.* ¶ 70.
[94] *Id.*

## 2. Lockton Pursues Patent Litigation Financing for WinView

As I noted above, in parallel with the bridge financings, Rogers directed Lockton, as WinView's CIO, to attempt to monetize WinView's patents through patent litigation.[95] In connection with this pursuit, Lockton met with law firms to discuss potential representation of WinView on a contingency fee basis.[96] Lockton also met with several patent litigation funding firms.[97] By mid-2019, WinView had reached an agreement with a law firm to represent WinView on a contingency-fee basis to pursue patent infringement litigation, though it was still seeking financing for litigation and licensing costs.[98]

## 3. The Board Informs Lockton of the Merger

On November 16, 2019, Lockton informed Rogers on a call that he had obtained the necessary litigation funding.[99] During the call, however, Rogers informed Lockton that the WinView Board had executed a binding term sheet to sell WinView's assets, including WinView's platform and patents.[100] Rogers explained to Lockton that the Board planned to merge WinView with Frankly and Torque, which both traded on the Toronto Venture Exchange.[101] Accordingly, to the

---

[95] *Id.* ¶¶ 61, 69, 71–74.
[96] *Id.* ¶ 72.
[97] *Id.*
[98] *Id.* ¶ 74.
[99] *Id.* ¶ 75.
[100] *Id.*
[101] *Id.*

Amended Complaint, Rogers explained to Lockton on the call that the Merger was fully supported by the other Director Defendants (Ratner, Jacoboski, Goodroe, and Maas) because the Board wanted liquidity, and, "as secured creditors," they wanted "a public market valuation for their secured loans."[102] As I discussed above, the Merger was structured such that Torque would purchase Frankly, and WinView would then merge into Torque.[103] The final entity was to be renamed Engine Media.[104]

Because Rogers was a Frankly stockholder and the Chairman of its Board,[105] the Board formed a Special Committee to negotiate the Merger, consisting of all the directors except Rogers.[106] Rogers represented to Lockton on the call, however, that he had personally negotiated the Merger.[107]

The Merger treated WinView's common stockholders differently from its secured creditors and preferred stockholders. The Merger eliminated WinView's common stock, with common stockholders receiving no cash and no shares in the new entity, Engine Media.[108] Instead, they received a contractual right to 50% of any recoveries on successful patent litigation regarding WinView's patents.[109]

---

[102] *Id.* ¶ 76.
[103] *Id.* ¶ 77.
[104] *Id.*
[105] *See supra* notes 15–17 and accompanying text.
[106] *Id.* ¶ 120
[107] *Id.* ¶ 121.
[108] *Id.* ¶ 82.
[109] *Id.* ¶¶ 82, 100, 114.

Future Engine Media stockholders would receive the other 50%.[110] Under the Merger agreement, Engine Media was required to designate a "representative" of these former WinView common stockholders, who was tasked with ensuring that Engine Media would take "reasonable efforts" to monetize the patent portfolio.[111] The Director Defendants, who were charged with selecting this representative, appointed Jacoboski.[112]

Meanwhile, secured creditors and preferred stockholders received stock in Torque, reflecting a $35 million valuation of WinView.[113] As secured creditors and preferred stockholders, the Defendants received $13.8 million of the $35 million.[114] Neither the Board nor the Special Committee commissioned a fairness opinion or retained outside advisors to evaluate different options and their effect on WinView's various classes of stock.[115]

Rogers formally announced the Merger to WinView's stockholders on November 22, 2019, during a stockholder call.[116] On that day, Rogers, Ratner, Jacoboski, and Graham each held WinView secured debt, preferred stock, and warrants to purchase additional preferred stock and common stock in WinView:

---

[110] *Id.* ¶ 114.
[111] *Id.* ¶ 107.
[112] *Id.* ¶ 108.
[113] *Id.* ¶¶ 81, 99.
[114] *Id.* ¶ 104.
[115] *Id.* ¶¶ 95, 122.
[116] *Id.* ¶ 84.

- Rogers held (i) WinView notes with an aggregate principal amount of $700,328.77, (ii) 188,074 shares of WinView Series B Preferred Stock, and (iii) warrants to purchase 879,656 shares of WinView Common Stock and 183,873 shares of WinView Series B Preferred Stock.[117]

- Ratner held (i) WinView notes with an aggregate principal amount of $700,350.68, (ii) 188,074 shares of WinView Series B Preferred Stock, and (iii) warrants to purchase 183,873 shares of WinView Series B Preferred Stock, 398,927 shares of WinView Series A Preferred Stock, and 879,656 shares of WinView Common Stock.[118]

- Jacoboski held (i) WinView notes with an aggregate principal amount of $475,000.00 and (ii) warrants to purchase 183,873 shares of WinView Series B Preferred Stock, 602,323 shares of WinView Series A Preferred Stock, and 792,821 shares of WinView Common Stock.[119]

- Graham held (i) WinView notes with an aggregate principal amount of $2,000,000, (ii) 5,883,953 shares of WinView Series B Preferred Stock, and (iii) warrants to purchase 1,470,988 shares of WinView Series B Preferred Stock and 1,103,241 shares of WinView Common Stock.[120]

---

[117] *Id.* ¶ 85.
[118] *Id.*
[119] *Id.*
[120] *Id.*

- Goodroe held (i) WinView notes with an aggregate principal amount of $700,438.36, (ii) 763,585 shares of WinView Series A Preferred Stock, (iii) 188,074 shares of WinView Series B Preferred Stock, and (iv) warrants to purchase 87,067 shares of WinView Series A Preferred Stock and 879,656 shares of WinView Common Stock.[121]

### 4. WinView Completes a Fifth Bridge Loan

On the November 22, 2019 stockholder call, Rogers stated that in order to cover expenses until the consummation of the Merger, WinView needed to raise $1.2 million through a secured bridge loan.[122] The proposed loan amount was later increased to $1.4 million.[123] Under the terms of the fifth bridge loan, lenders would to be paid back with interest, plus $3 in Torque stock for every $1 loaned, with the loans being fully secured by WinView's patents.[124] Lenders also received warrants for WinView common stock, giving them the right to purchase 3.3 shares of WinView Common Stock for $0.01 per share for each $1.37 loaned.[125] The warrants could be exercised at any time,[126] but even if they were not exercised before the Merger closed, they entitled holders to a portion of the patent litigation revenues that

---

[121] *Id.* The Amended Complaint also alleges that WinView equity was also held by a trust that Goodroe controlled, and by a Goodroe family member. *Id.* ¶ 85 n.1.

[122] *Id.* ¶ 86.

[123] *Id.*

[124] *Id.* ¶ 87.

[125] *Id.*

[126] *Id.* ¶ 91.

19

were reserved for former WinView common stockholders.[127] Thus, the fifth bridge loan had the effect of diluting the former WinView common stockholder's contractual right to a payout on successful patent litigation.[128] According to the Amended Complaint, the Defendants participated in this fifth bridge loan, which provided them with enough warrants to control, if exercised, 51% of WinView's voting stock.[129] Even without exercising the warrants, the Defendants controlled 45% of WinView's total voting stock as of December 2019.[130]

On December 1, 2019, Lockton sent a letter to WinView's Board expressing that he believed the opportunity to pursue patent litigation on behalf of WinView as a standalone company was a superior alternative to the Merger.[131] Lockton provided an update on his discussions with potential financers, including that two firms had executed letters of intent and that he anticipated four more to execute similar letters in the coming days.[132] Lockton also objected to perceived conflicts of interest of the Director Defendants, given that they had threatened, as secured creditors, to foreclose on WinView's patents.[133]

---

[127] *Id.* ¶ 92.
[128] *Id.*
[129] *Id.* ¶¶ 88–92.
[130] *Id.* ¶ 91.
[131] *Id.* ¶ 93.
[132] *Id.*
[133] *Id.* ¶ 94.

Three days later, on December 4, 2019, WinView's counsel, Damien Weiss, called Lockton to relay a conversation he had with Rogers about the letter.[134] Weiss told Lockton that the Board was "furious," and threatened that "the Board would immediately foreclose on the patents, and pursue patent litigation on their own behalf," unless Lockton agreed to several concessions.[135] Those concessions included (i) executing a consulting agreement to represent Engine Media in patent litigation at a 30% salary reduction, (ii) agreeing to release the Board from all fiduciary obligations owed to him and his family as WinView stockholders, (iii) agreeing not to communicate with other stockholders or assist them in any way in matters relating to the Board's actions, and (iv) signing a proxy that would give the Board the right to vote his and his family's WinView stock.[136] Weiss then emailed Lockton's attorney executed copies of agreements memorializing those concessions, and reiterated that the Board would foreclose on the WinView patents if Lockton did not sign the agreements within 48 hours.[137] The Amended Complaint does not indicate whether Lockton agreed to these concessions.

The following week, on December 10 and 11, 2019, certain of the Defendants[138] emailed WinView stockholders, stating that the only alternative to the

---

[134] *Id.* ¶ 124.
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] The Amended Complaint does not specify the identity of these Defendants. *See id.* ¶¶ 138–39.

Merger would be for the secured noteholders, which included the Defendants, to foreclose on WinView's patents.[139] This statement was reiterated to stockholders by Pavish, Jacoboski, Maas, and WinView's counsel.[140]

According to the Amended Complaint, Rogers interfered with the patent litigation financing that Lockton had posed as an alternative to the Merger. For instance, Rogers emailed one litigation funder on January 15, 2020 and stated that WinView's "patent counsel" had "heavily advised that this would not be a good time to engage in a discussion on patent litigation financing."[141]

### 5. WinView's Board and Stockholders Approve the Merger

WinView's Board approved the Merger on March 11, 2020.[142] On March 30, 2020, the WinView Board sent an information statement to WinView stockholders regarding the Merger (the "Information Statement").[143] The Amended Complaint asserts that the Information Statement contained numerous misstatements, including about the ability of Torque and Frankly to finance patent litigation following the Merger, the efforts by the WinView Board to obtain financing as a standalone company and the availability of financing alternatives, Rogers' role in negotiating the Merger, and the nature of WinView's discussions with potential litigation

---

[139] *Id.* ¶ 138.
[140] *Id.*
[141] *Id.* ¶ 132.
[142] *Id.* ¶ 147.
[143] *Id.* ¶ 126.

22

financers.[144]  The Information Statement did, however, attach in full each of the

letters from Lockton criticizing the Merger.[145]

The Merger was approved by a majority of the WinView stockholders voting

together as one class.[146]  WinView never disclosed the breakdown of the vote,

including what percentage of preferred stockholders and common stockholders

approved the Merger, and whether the Defendants exercised the warrants that would

increase their stock ownership to 51%.[147]

The Merger closed on May 11, 2020.[148]  For fourteen months after the Merger

closed, Engine Media failed to file any patent lawsuits, and therefore has made no

payments to the former WinView common stockholders.[149]

*C. Procedural History*

The Plaintiffs initiated this action on January 1, 2021.[150]  After the Defendants

filed motions to dismiss the initial complaint,[151] the Plaintiffs filed an amended

---

[144] *See, e.g.*, *id.* ¶¶ 125–46.

[145] Transmittal Decl. Callan R. Jackson Pursuant 10 *Del. C.* § 3927 Defendants Thomas S. Rogers, Hank J. Ratner, R. Bryan Jacoboski, and Steve Goodroe's Opening Br. Supp. Mot. Dismiss, Ex. 1 [hereinafter the "Information Statement"], Annexes C, K.

[146] *See id.* ¶¶ 89, 92.

[147] *Id.* ¶ 92.

[148] *Id.* ¶ 165.

[149] *Id.* ¶ 161.  In their motion to dismiss briefing, the Defendants asserted that WinView filed certain patent lawsuits in July 2021, after the Plaintiffs commenced this action.  Defs. Thomas S. Rogers, Hank J. Ratner, R. Bryan Jacoboski, and Steve Goodroe's Opening Br. Supp. Their Mot. Dismiss, Dkt. No. 71 at 21 [hereinafter "Directors' OB"].

[150] *See* Verified Compl. Breach Fiduciary Duties, Dkt. No. 1.

[151] *See* Mot. Dismiss, Dkt. No. 37; Def. Graham Holdings Company's Mot. Dismiss, Dkt. No. 38l Def. Jake Maas' Mot. Dismiss, Dkt. No. 42.

complaint on July 8, 2021, which is currently the operative complaint (the "Amended Complaint").[152] The Amended Complaint brings claims for breaches of fiduciary duty (Counts I and II), civil conspiracy (Count III), and unjust enrichment (Count IV) against all of the Defendants.[153] The Defendants moved to dismiss the Amended Complaint and filed opening briefs on August 27, 2021,[154] and the parties completed their briefing on October 27, 2021.[155] I held oral argument on November 8, 2021, and I consider the matter fully submitted as of that date.

## II. ANALYSIS

### A. *Legal Standards*

The Defendants have moved to dismiss the Amended Complaint under Rule 12(b)(6). At the pleading stage, I must take as true all well-pled allegations and draw inferences therefrom in the light most favorable to the Plaintiffs.[156] I may only grant

[152] *See generally* Am. Compl.

[153] *See id.* ¶¶ 172–05.

[154] *See* Directors' OB; Def. Jake Maas' Joinder Defs.' Thomas S. Rogers, Hank J. Ratner, R. Bryan Jacoboski, and Steve Goodroe's Opening Br. Supp. Their Mot. Dismiss, Dkt. No. 73; Def. Graham Holdings Company's Opening Br. Supp. Its Mot. Dismiss, Dkt. No. 74 [hereinafter "Graham's OB"].

[155] *See* Pls.' Ans. Br. Opp'n Defs. Thomas S. Rogers, Hank J. Ratner, Steve Goodroe, R. Bryan Jacoboski's, and Jake Maas' Mot. Dismiss, Dkt. No. 76 [hereinafter "Pls.' First AB"]; Pls.' Ans. Br. Opp'n Def. Graham Holdings Company's Opening Br. Supp. Mot. Dismiss, Dkt. No. 77; Def. Graham Holdings Company's Reply Supp. Mot. Dismiss, Dkt. No. 80 [hereinafter "Graham's RB"]; Defs. Thomas S. Rogers, Hank J. Ratner, R. Bryan Jacoboski, and Steve Goodroe's Corrected Reply Br. Supp. Their Mot. Dismiss, Dkt. No. 82 [hereinafter "Directors' RB"].

[156] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 536–37 (Del. 2011).

the motions to dismiss if I find it not "reasonably conceivable" that the Plaintiffs may prevail.[157]

### B. The Merger Is Not Entitled to Corwin Cleansing

The Defendants contend that I must dismiss the Amended Complaint because the Merger was cleansed under the framework outlined in *Corwin v. KKR Financial Holdings LLC*.[158]   Under *Corwin*, when a transaction absent a controlling stockholder "is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[159]  As explained below, I find that the Merger is not entitled to *Corwin* cleansing.

The relevant vote for purposes of *Corwin* cleansing is that of the "disinterested" stockholders.[160]  "A stockholder is interested if it may derive pecuniary interest from one particular result or is otherwise unable to be fair-minded, unbiased, and impartial."[161]

Under the facts alleged, as secured creditors and preferred stockholders of WinView, the Defendants were interested stockholders for the purposes of *Corwin*. As discussed above, the Merger treated WinView's secured creditors and preferred

---

[157] *Id*. at 537.

[158] *See Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 308–14 (Del. 2015).

[159] *Id.* at 309.

[160] *Chester Cnty. Emps.' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019).

[161] *In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *63 (Del. Ch. May 6, 2021).

stockholders differently from its common stockholders.[162]  WinView secured creditors and preferred stockholders received stock in Torque valued at $35 million, while WinView common stockholders were eliminated and received only the contractual right to 50% of the proceeds from successful patent litigation brought by Engine Media—if such proceeds ever came to exist.[163]  The Merger thus conferred on WinView's preferred stockholders "benefits . . . not shared with the Company's . . . common stockholders."[164]  Accordingly, under these particular facts, the votes of preferred stock cannot count toward a *Corwin* majority.  And surely, the votes of shares held by the Defendants themselves cannot count as votes of "disinterested stockholders" for *Corwin* purposes.

Although the Amended Complaint does not allege the breakdown of the stockholder vote because WinView itself never disclosed that information,[165] it is reasonably conceivable that the Merger was not approved by a majority of WinView's disinterested shares.[166]  The WinView preferred and common stockholders voted together as one class of stock to approve the Merger.[167]  Besides Maas, who held no WinView stock, each of the other Defendants were interested for

---

[162] *See supra* notes 108–14 and accompanying text.
[163] *See supra* notes 108–14 and accompanying text.
[164] *Pattern Energy*, 2021 WL 1812674, at *63.
[165] Am. Compl. ¶ 92.
[166] Until the record is sufficient to a reckoning of what percentage of the vote for the Merger was composed of stock of the Director Defendants, and what part of that vote was composed of preferred stock, I need not decide precisely what shares are sterilized for *Corwin* purposes.
[167] *See id.* ¶¶ 89, 92.

purposes of the stockholder vote because they held secured debt and preferred stock in WinView. Those Defendants together controlled 45% of WinView's voting stock, even without exercising the warrants that would have increased their ownership percentage to 51%.[168]

Moreover, given that the fifth bridge loan that conferred those warrants to the Defendants was timed contemporaneously with the Merger discussions, it is reasonably conceivable that the Defendants exercised them to gain majority stockholder approval.[169] Accordingly, it is reasonably conceivable that at least 51% of the WinView voting stock was held by interested stockholders. Without any information regarding the remaining 49% percent of WinView's voting stock, including the amount that represented interested preferred stock and the amount that voted in favor of the Merger, I cannot hold as a matter of law that the Merger was approved by a majority of WinView's disinterested shares.

The underlying rationale for applying business judgment under *Corwin* is that the Court should acquiesce to a judgement expressed by a majority of unconflicted stockholders. Denying Corwin cleansing does not mean that the vote of the majority of WinView stock is not effective to approve the Merger under the WinView

---

[168] *Id.* ¶ 91.
[169] At oral argument, the Defendants asserted that they did not exercise the warrants. Tr. Oral Argument re Defs.' Mot. Dismiss at 6:18–7:2; *see also* Graham's RB at 6. At the pleading stage, without the benefit of a record, it would be inappropriate for me to credit that assertion, which is untethered to the Amended Complaint.

Charter, which calls for a confirmatory vote of all shares in the aggregate, regardless of class. Instead, it simply means that a review of the merger under traditional principals of fiduciary duty shall proceed; viewed correctly, *Corwin* is quasi-jurisdictional—it precludes (under rigorous conditions) certain stockholder-approved transactions from further judicial review. Under the facts pled, such preclusion is unwarranted here.

Accordingly, at the pleading stage, the Merger is not entitled to *Corwin* cleansing. Based on this finding, I need not examine the Plaintiffs' allegations of coercion and informational deficits as precluding application of *Corwin*.

### 1. The Amended Complaint Pleads a Non-Exculpated Breach of Fiduciary Duty Claim Against the Director Defendants

WinView's Charter contained an exculpatory provision, as authorized by 8 *Del. C.* § 102(b)(7), which provided as follows:

> To the fullest extent permitted by the Delaware General Corporation Law as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director.[170]

"[W]hen a director is protected by an exculpatory charter provision, a plaintiff 'must plead a non-exculpated claim for breach of fiduciary duty . . . or that director

---

[170] Transmittal Decl. Callan R. Jackson Pursuant 10 *Del. C.* § 3927 Defendants Thomas S. Rogers, Hank J. Ratner, R. Bryan Jacoboski, and Steve Goodroe's Opening Br. Supp. Mot. Dismiss, Ex. 2, Art. X § 1.

will be entitled to dismissal from the suit.'"[171]  "A 'non-exclupated claim for breach of fiduciary duty,' for purposes of Section 102(b)(7), means a well-pled claim for breach of the duty of loyalty (in any of its forms)."[172]

"To plead a claim for breach of the duty of loyalty that will overcome a motion to dismiss, a plaintiff must plead sufficient facts to support a rational inference that the corporate fiduciary acted out of material self-interest that diverged from the interests of the shareholders."[173]  "To plead interestedness, a plaintiff can plead the fiduciary received 'a personal financial benefit from a transaction that is not equally shared by the stockholders,' or 'was a dual fiduciary and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit not shared with the stockholders.'"[174]

### a. The Amended Complaint Pleads Breach of Loyalty Claims Against Defendants Ratner, Goodroe, and Jacoboski

Despite their status as preferred stockholders and secured creditors, Defendants Ratner, Goodroe, Jacoboski, and Maas contend that they were not interested in the Merger.  As I held above, as secured creditors and preferred stockholders who received stock in Torque, Ratner, Goodroe and Jacoboski

[171] *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018) (quoting *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179 (Del. 2015)).

[172] *Id.*

[173] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *21 (Del. Ch. Mar. 31, 2017), *as revised* (Apr. 11, 2017).

[174] *Pattern Energy*, 2021 WL 1812674, at *66 (quoting *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 24, 2017)).

"receive[d] a financial benefit not available to stockholders equally."[175]  Likewise, Maas was a dual fiduciary of WinView and Graham, which similarly "received a unique benefit not shared with the stockholders"[176] by virtue of its status as a secured creditor and preferred stockholder.  Nonetheless, Ratner, Goodroe, Jacoboski and Maas make several arguments as to why they were disinterested in the Merger.  As explained below, on this preliminary record I find none of them persuasive.

*First*, they argue that WinView was insolvent, which meant that they were required to consider the interests of WinView's noteholders and preferred stockholders, in addition to WinView's common stockholders.[177]  Per the Director Defendants, they achieved an excellent result for all these stakeholders, including fending off debt foreclosure and preserving certain IP-related rights to the common stockholders, in spite of the insolvency.  But the Amended Complaint does not allege that WinView was insolvent.  The Defendants rely only on material outside of the Amended Complaint to support their assertion of insolvency.  Although the Plaintiffs do not dispute that WinView was in a perilous and illiquid financial position, they assert instead that it was merely in the "zone of insolvency," which has no

---

[175] *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *12 (Del. Ch. Aug. 18, 2006); *see supra* notes 162–64 and accompanying text.

[176] *Pattern Energy*, 2021 WL 1812674, at *66 (quoting *Frederick Hsu*, 2017 WL 1437308, at *26)).

[177] Directors' OB at 46–48; Directors' RB at 21–22.

"implications for fiduciary duty claims."[178]  The Plaintiffs also allege that the IP held by WinView had a value of $175 million, while its debt was only $25 million.[179]

To hold as a matter of law that WinView was insolvent would require defendant-friendly inferences based on material outside of the Amended Complaint, and resolution of factual disputes in favor of the moving party.  Accordingly, I conclude that the question of WinView's solvency is a factual issue that awaits a developed record.

*Second*, Ratner, Goodroe, Jacoboski and Maas argue that the Plaintiffs have failed to plead facts implying that the consideration they received for their secured debt and preferred stock holdings was material to them.[180]  For a benefit to be material, it must be "so substantial as to have rendered it improbable that [the board] could discharge their fiduciary obligations in an even-handed manner."[181]

I conclude that the Merger consideration "provided reasonably conceivable material benefits to the Director Defendants."[182]  As I discussed above, Ratner, Goodroe and Jacoboski each held notes with six-figure principal balances, as well as hundreds of thousands of shares of WinView preferred stock and warrants on

---

[178] *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015).
[179] Am. Compl. ¶¶ 80, 87, 94, 116, 139.
[180] Directors' OB at 48–52.
[181] *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 951 (Del. Ch. 2001) (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 618 (Del. Ch. 1999)).
[182] *Tangoe*, 2018 WL 6074435, at *13.

WinView preferred and common stock.[183]  Graham likewise held notes with seven-figure balances, millions of shares of preferred stock, and warrants to purchase WinView preferred and common stock[184]:

| Defendant | Aggregate Note Balance | Common Stock | Preferred Stock | Common Stock Warrants | Preferred Stock Warrants |
|---|---|---|---|---|---|
| Ratner | $700,350.68 | – | 188,074 | 879,656 | 582,800 |
| Jacoboski | $475,000.00 | – | – | 792,821 | 786,196 |
| Graham | $2,000,000.00 | – | 5,883,953 | 1,103,241 | 1,470,988 |
| Goodroe | $700,438.36 | – | 951,659 | 879,656 | 270,940 |

As WinView's cash dwindled and the Company veered towards the zone of insolvency, the Defendants' rights as creditors and preferred stockholders became "increasingly chimerical."[185]  The Amended Complaint alleges that, under the Merger, the Defendants realized $13.8 million of the total $35 million in Merger consideration.[186]  Giving the Plaintiffs all reasonable inferences, it is reasonably conceivable that this consideration was material to Ratner, Goodroe and Jacoboski, and to Maas as a fiduciary of Graham.[187]

---

[183] Am. Compl. ¶ 85.
[184] *Id.*
[185] *Tangoe*, 2018 WL 6074435, at *13.
[186] Am. Compl. ¶ 104.
[187] *See Tangoe*, 2018 WL 6074435, at *13.

*Finally*, Ratner, Goodroe, Jacoboski and Maas contend that the duty of loyalty did not require them to waive their rights as preferred stockholders and secured creditors in approving the Merger. "[T]he duty of loyalty requires that any power over the corporation held in a fiduciary capacity may be exercised only for the purpose of advancing collective/corporate welfare."[188] That said, "fiduciary obligation does not require self-sacrifice."[189] As a result, "one who may be both a creditor and a fiduciary (*e.g.*, a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights."[190] In other words, "a creditor does not lose his rights as a creditor solely because he is also a . . . director,"[191] and "there is nothing under Delaware law that requires [a fiduciary] to waive enforceable rights that it has as a holder of preferred stock or as a lender."[192]

But "the obverse of this proposition is true as well": a creditor or preferred stockholder cannot "misuse[] a fiduciary position . . . to try to advantage himself in his creditor [or preferred stockholder] capacity."[193] The allegations here go far beyond non-waiver of creditor's rights by the Defendant Directors. A plaintiff can

---

[188] *Odyssey Partners, L.P., Odyssey-ABC Ltd. P'ship*, 1996 WL 422377, at *3 (Del. Ch. July 24, 1996).
[189] *Id.*
[190] *Id.*
[191] *Cox v. Crawford-Emery*, 2007 WL 4327775, at *4 n.26 (Del. Ch. Nov. 30, 2007).
[192] *Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828, 854 (Del. Ch. 2003).
[193] *Odyssey*, 1996 WL 422377, at *4.

plead a breach of loyalty claim against a fiduciary creditor or preferred stockholder by alleging "facts other than" the mere "exercise of the legal rights acquired by a fiduciary"—for example, by pleading that a fiduciary "fail[ed] to explore fully available sources of additional capital" in order to prioritize the fiduciaries' creditor interests over their fiduciary duties.[194] The Amended Complaint alleges precisely that: Ratner, Goodroe, Jacoboski and Maas approved a Merger that treated them, as WinView secured creditors and preferred stockholders, favorably in comparison to WinView's common stockholders, without considering alternative sources of financing, because they wanted "a public market valuation for their secured loans."[195]

Here, the Merger did not constitute a mere "exercise of [the Director Defendants'] creditor rights,"[196] such as the right to foreclose on WinView's patents. Indeed, the Merger represented an *alternative* to the exercise of those rights. The Merger "created subclasses of" WinView stockholders and secured creditors: "One class would remain; the other would go. The class that would remain would profit, at the other's expense, if [the Merger] underpaid those departing."[197]

---

[194] *Id.*
[195] Am. Compl. ¶ 76.
[196] *Odyssey*, 1996 WL 422377, at *3–4.
[197] *PNB*, 2006 WL 2403999, at *12.

In that circumstance, the status of Ratner, Goodroe, and Jacoboski as "stockholders who were eligible to remain rendered them conflicted."[198] Likewise, Maas was similarly conflicted as a fiduciary for Graham, another stockholder "eligible to remain." As fiduciaries for the WinView common stockholders, Ratner, Goodroe, Jacoboski, and Maas "were obliged to treat all stockholders fairly."[199] They were not thereby barred from "propos[ing] a transaction whereby [the] common stockholders would be [eliminated]"; the relevant question is "how [they] could discharge [their] obligation to the departing stockholders in a situation when [their] own self-interest conflicted with the interests of stockholders generally."[200] In such a circumstance, "the core insight of the entire fairness standard comes into play."[201] Accordingly, it is reasonably conceivable that Ratner, Goodroe, Jacoboski and Maas were interested in the Merger and breached their duty of loyalty.

### b. The Amended Complaint Pleads a Breach of Loyalty Claim Against Defendant Rogers

Defendant Rogers concedes that he was a dual fiduciary because he served as the Chairman of Frankly and as the Executive Chairman of WinView at the time of

---

[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] *Id.*

the Merger.[202]  He contends, however, that I must dismiss the Amended Complaint against him because he "abstained from voting on the [Merger]."[203]

There is "no *per se* rule that unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction."[204]  Notably, Rogers does not contend that he abstained from negotiating the Merger.  The Amended Complaint alleges that Rogers told Lockton in November 2019 that he had personally negotiated a binding term sheet for the Merger.[205]  Delaware law does not allow directors who negotiated a transaction to "specifically to shield themselves from any exposure to liability" by "deliberately absent[ing] themselves from the directors' meeting at which the proposal is to be voted upon."[206]  I therefore decline to "accord[] exculpatory significance" to Rogers' "nonvote."[207]  It is reasonably conceivable at this pleading stage that Rogers breached his duty of loyalty by participating in the Merger negotiations.

Accordingly, I decline to dismiss Counts I and II against the Director Defendants.

---

[202] Directors' OB at 54–55; Directors' RB at 29–30.
[203] Directors' OB at 54–55; Directors' RB at 29–30.
[204] *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995).
[205] Am. Compl. ¶ 121.  The Defendants characterize this allegation as "conclusory" and chastise the Plaintiffs for failing to seek books and records before bringing their claims.  Defendants' RB at 29–30.  Although WinView's books and records may have elucidated Rogers' alleged role in negotiating the Merger, the allegation that Rogers told Plaintiff Lockton that he negotiated the term sheet is sufficient to establish reasonable conceivability.
[206] *Tri-Star*, 1995 WL 106520, at *3.
[207] *Id.*

*C. The Amended Complaint Fails to Plead that Graham Was a Controlling Stockholder*

The Plaintiffs next contend that Graham owed fiduciary duties to WinView common stockholders as a controlling stockholder. The Plaintiffs contend that Graham formed a control group with the Director Defendants, which held at least 45% of WinView's voting shares, and potentially 51% of WinView's voting shares if the Defendants exercised their warrants.[208]

"Delaware law imposes fiduciary duties on those who effectively control a corporation."[209] "The premise for contending that a controller owes fiduciary duties 'is that the controller exerts its will over the enterprise in the manner of the board itself.'"[210] In other words, a controller so acting is exercising dominion over the property of the other stockholders, and is therefore a classic fiduciary. At the pleading stage, the control group inquiry involves two questions: "(1) whether the alleged control group was indeed a group, and (2) whether the alleged control group exercised sufficient control."[211] The first question is dispositive here.

"To demonstrate that a group of stockholders exercises 'control' collectively," the Plaintiffs must plead that the Defendants "are 'connected in some legally significant way'—such as 'by contract, common ownership, agreement, or other

---

[208] *See supra* notes 129–30 and accompanying text.
[209] *Patel v. Duncan*, 2021 WL 4482157, at *10 (Del. Ch. Sept. 30, 2021), *as corrected* (Oct. 4, 2021) (quoting *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020)).
[210] *Id.* (quoting *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006)).
[211] *Id.* at *11.

arrangement—to work together toward a shared goal.'"[212]  Simply alleging that the

Defendants shared a "concurrence of self-interest" does not suffice.[213]  Rather, the

Plaintiffs must plead "some indication of an actual agreement," though "it need not

be formal or written."[214]

Here, the Plaintiffs contend that Graham and the Director Defendants were

"similarly situated" because they each held secured debt and preferred stock, which

"tied them together to serve their interests in a legally significant way."[215]  That is

not enough to establish a control group.  "[I]f all a complaint alleges is that a group

of shareholders have 'parallel interests,' such allegations are insufficient as a matter

of law to support the inference that the shareholders were part of a control group."[216]

Accordingly, without more, the allegation that Graham and the Director Defendants

were similarly situated because they each held secured debt and preferred stock fails

as a matter of law.

Absent a control group, the allegations against Graham are insufficient to

support an inference that Graham owed fiduciary duties as a controlling stockholder.

Although the Plaintiffs do not allege precisely what percentage of WinView's voting

stock was owned by Graham, the Amended Complaint concedes that Graham owned

---

[212] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251–52 (Del. 2019) (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014)).
[213] *Id.* at 252.
[214] *Id.*
[215] Pls.' First AB at 11.
[216] *Dubroff v. Wren Holdings, LLc*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009).

38

less than 50%.[217]   When a stockholder owns less than 50% of the corporation's outstanding stock, "a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct."[218]  "The bare conclusory allegation that a minority stockholder possessed control is insufficient."[219]   Instead, the Amended Complaint must plead facts "showing that the minority stockholder 'exercised actual domination and control over . . . [the] directors."[220]  In other words, "a minority blockholder is not considered to be a controlling stockholder unless it exercises 'such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control.'"[221]  The minority blockholders power must be "so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution" from the controlling minority blockholder.[222]

The Amended Complaint alleges that Graham was WinView's "largest stockholder";[223] that Graham held debt in WinView that was secured by WinView's

---

[217] *See* Am. Compl. ¶ 186 (alleging that Defendants together controlled, at most, 51% in the aggregate).

[218] *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)).

[219] *Id.*

[220] *Id.* at 664–65 (quoting *In re Sea-Land Corp. S'holders Litig.*, 1988 WL 49126, at *3 (Del. Ch. May 13, 1988)).

[221] *Id.* at 665.

[222] *Id.* (quoting *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)).

[223] Am. Compl. ¶ 13.

only significant assets, its patents;[224] that Graham designated a "representative" on the WinView Board, Maas;[225] that Maas held the sole power of attorney on behalf of all secured creditors, allowing him to foreclose on WinView's patents in the event of a default;[226] and that Maas served as the Chairman of the Special Committee charged with negotiating the Merger.[227] Nonetheless, the Amended Complaint alleges that Maas "uniformly acquiesced to and supported any request by Rogers, whether in the company's best interest or otherwise."[228] In other words, the Amended Complaint concedes that Maas' position on the Board did not confer control to Graham. Accordingly, I cannot find on the facts alleged that it is reasonably conceivable that Graham owed fiduciary duties as a controlling stockholder. Count II is therefore dismissed against Graham.

*D. The Plaintiffs' Civil Conspiracy Claims*

In addition to the breach of fiduciary duty claims, the Amended Complaint asserts civil conspiracy claims in Count III against all of the Defendants for conspiring to "breach their fiduciary duty of loyalty to [the] Plaintiffs by forcing through the unfair and inequitable Merger."[229] "The elements for civil conspiracy

---

[224] *Id.* ¶¶ 13, 85.
[225] *Id.* ¶ 45.
[226] *Id.* ¶¶ 38, 45, 55.
[227] *Id.* ¶ 121.
[228] *Id.*
[229] *Id.* ¶ 195; *see also id.* ¶¶ 194–98.

40

under Delaware law are: (1) a confederation or combination of two or more persons;

(2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[230]

### 1. The Amended Complaint Fails to State Civil Conspiracy Claims Against the Director Defendants

"Delaware law requires an independent tort underlying a civil conspiracy."[231]

That is, civil conspiracy "is vicarious liability. It holds a third party, not a fiduciary,

responsible for a violation of fiduciary duty."[232] Accordingly, civil conspiracy for

breach of fiduciary duty does not apply to the Director Defendants, "[who] owe[d]

the [WinView stockholders] a direct fiduciary duty."[233] I therefore dismiss Count III

against the Director Defendants.

### 2. The Amended Complaint Fails to Plead a Civil Conspiracy Claim Against Graham

In cases involving the internal affairs of corporations, this Court often

evaluates civil conspiracy claims using the elements traditionally associated with

aiding and abetting claims.[234] This is because "in cases involving the internal affairs

---

[230] *Chester Cnty.*, 2019 WL 2564093, at *20 (quoting *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005)).

[231] *OptimisCorp v. Waite*, 2015 WL 5147038, at *56 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016).

[232] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005).

[233] *Id.*; *see also OptimisCorp*, 2015 WL 5147038, at *59 ("I seriously question whether a cause of action exists under Delaware law for a conspiracy among fiduciaries to breach a fiduciary duty.").

[234] *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1056–58 (Del. Ch. 1984) (defining conspiracy using the traditional elements associated with aiding and abetting breach of fiduciary duty), *aff'd*, 575 A.2d 1131 (Del. 1990); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) (same); *Malpiede v. Townson*, 780 A.2d 1075, 1098 n.82 (Del. 2001) (noting in merger action that "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we do not find that distinction meaningful here"); *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL

of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law."[235] "[T]he basis of such a claim, regardless of how it is captioned, is the idea that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship."[236] Accordingly, and given the plaintiff-friendly stage of the proceedings, I apply the rubric for aiding and abetting here.

"Like the test for civil conspiracy, the test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter—a plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the non-fiduciary."[237] Because I have held that it is reasonably conceivable that the Director Defendants breached their fiduciary duties to WinView's common stockholders in connection with the Merger, the first two elements of this test are satisfied at the pleading stage. Accordingly,

---

694397, at *15 n.11 (Del. Ch. Nov. 21, 1995) ("For the purposes of the instant case, however, analysis under the civil conspiracy test mirrors the analysis under the civil conspiracy/aiding and abetting standard. Both primarily focus on the understanding of the parties with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties."); *Alex. Brown*, 2005 WL 2130607, at *10 ("Claims for civil conspiracy are sometimes called aiding and abetting."); *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) ("A claim for conspiracy to commit a breach of fiduciary duty is usually pled as a claim for aiding and abetting, and although there are differences in how the elements of the two doctrines are framed, it remains unclear . . . how the two diverge meaningfully in substance or purpose."); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005) (distinction between aiding and abetting and civil conspiracy was "mere hair-splitting [that] contravenes the equitable principle of looking to the substance rather than to the form").

[235] *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006).

[236] *Alex. Brown*, 2005 WL 2130607, at *10 (emphasis omitted).

[237] *GC-Sun*, 910 A.2d at 1038–39.

the pertinent question is whether the Amended Complaint pleads Graham's "knowing participation" in those breaches of fiduciary duty.

The "knowing participation" element "is a "stringent standard that turn[s] on proof of scienter."[238] The Plaintiffs must plead that Graham "kn[ew] the fiduciary [wa]s breaching his fiduciary duty and then . . . participate[d], in some way, in that breach."[239] That participation must take the form of "'substantial assistance' to the primary violator."[240]

Although "knowing participation" is a stringent standard, "[u]nder the liberal pleading standards of this court, . . . knowledge may be averred generally."[241] Under Delaware law, "the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."[242] What is missing in the allegations, however, is anything implying the participation of Graham in the breach. There are no allegations of Graham providing substantial assistance to Maas or the other Director Defendants concerning the

---

[238] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 688 (Del. Ch. 2017) (quoting *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014)).

[239] *In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019).

[240] *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (quoting *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015)).

[241] *Weiss v. Swanson*, 948 A.2d 433, 449 (Del. Ch. 2008); *accord LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *14 (Del. Ch. Mar. 28, 2018) ("knowledge may be averred generally" in conspiracy claim).

[242] *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch.), *aff'd*, 126 A.3d 1115 (Del. 2015).

breach. There is not even an allegation that Graham and Maas communicated in any way regarding the Merger. Although I can impute Maas' knowledge to Graham, the facts pled do not support a reasonable implication that Graham substantially assisted any breach of duty.[243] Accordingly, Count III is dismissed against Graham, as well.[244] This holding does not, however, leave the Plaintiffs without a potential remedy against Graham; as discussed below, I conclude that the Amended Complaint adequately states an unjust enrichment claim against Graham.

*E. The Plaintiffs' Unjust Enrichment Claims Survive*

The Amended Complaint also asserts claims for unjust enrichment against all of the Defendants, because the Merger was allegedly "the product of breaches of fiduciary duty."[245] "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[246]

The Plaintiffs' attempt to satisfy the "absence of justification" element is premised solely on their argument that the Defendants breached fiduciary duties in

---

[243] *Brown v. Perrette*, 1999 WL 342340, at *13 (Del. Ch. May 14, 1999) ("[A]bsent a showing that the shareholder nominator knowingly participated in the alleged wrong, the wrongful activities of a nominated director cannot be imputed to the shareholder to sustain an aiding and abetting claim.").

[244] I note that records available under Section 220, resort to which the Plaintiffs eschewed, would presumably have disclosed any participation of Graham in the Merger sufficient to bolster the implication of knowing participation in breaches of duty.

[245] Am. Compl. ¶¶ 199–05.

[246] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

connection with the Merger. This is sufficient to deny the Motion to Dismiss against Graham; as set out above, the Plaintiffs have failed to plead a civil conspiracy claim against Graham, but Graham's knowingly accepting the fruits of its agent's breach of duty in the context of the Merger is sufficient to this cause of action.

The cause of action against the Director Defendants is more problematic. The Plaintiffs' unjust enrichment claim is entirely coterminous with claims that these Defendants breached of fiduciary duties. Because the Plaintiffs are only "entitled to one recovery,"[247] it therefore appears that the remedy for the Plaintiffs' breach of fiduciary duty would supersede any remedy for unjust enrichment against the Director Defendants. Although I am skeptical that the unjust enrichment claim would provide any relief separate and distinct from the breach of fiduciary and aiding and abetting claims, bowing under the weight of precedent I decline to dismiss the unjust enrichment claims against the Director Defendants at this pleading stage.[248]

---

[247] *matter of Est. of DeGroat*, 2020 WL 2078992, at *23 (Del. Ch. Apr. 30, 2020).

[248] *See Tornetta v. Musk*, 250 A.3d 793, 813 (Del. Ch. 2019) (denying motion to dismiss unjust enrichment claim that "essentially duplicates [] breach of fiduciary duty claims"); *Espinoza v. Zuckerberg*, 124 A.3d 47, 66–67 (Del. Ch. 2015) ("If defendants' sole basis for summary judgment on a duplicative unjust enrichment claim is the failure of the underlying claim for breach of fiduciary duty, then the survival of the fiduciary duty claim logically allows the claim for unjust enrichment to survive as well."); *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014) ("[W]here the Court does not dismiss a breach of fiduciary duty claim, it likely does not dismiss a duplicative unjust enrichment claim."); *Dubroff v. Wren Holdings, LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011) ("Delaware law does not appear to bar bringing [duplicative breach of fiduciary duty and unjust enrichment] claims."); *Calma v. Templeton*, 2015 WL 1951930, at *20 (Del. Ch. Apr. 30, 2015) (denying motion to dismiss unjust enrichment claim despite "no alleged unjust enrichment separate or distinct from the alleged breach of fiduciary duty claim"); *Reith v. Lichtenstein*, 2019 WL 2714065, at *21 (Del. Ch. June 28, 2019) ("[T]hough defendants argue an unjust enrichment claim usually fails along with a fiduciary duty claim, the

*F. The Remedy of Recission*

Finally, the Defendants ask that I dismiss the request for rescission. Because I have found that the Plaintiffs have stated claims for which relief might be granted, "the nature of that relief is not relevant and need not be addressed" at this pleadings stage.[249] The "determination of relief is beyond the scope of this motion and premature without an established evidentiary record."[250] I therefore decline to address the Defendants' request to dismiss the request for rescission here.

### III. CONCLUSION

For the foregoing reasons, the Motions to Dismiss are GRANTED in part and DENIED in part. The parties should confer and submit a form of order consistent with this opinion.

---

two claims can also survive together."); *DeGroat*, 2020 WL 2078992, at *21 ("When an unjust enrichment claim relies upon a breach of fiduciary duty, a successfully pled breach of fiduciary duty claim likely supports a well-pled claim for unjust enrichment.").

[249] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 991 (Del. Ch. 2000) (quoting *Chaffin v. GNI Grp., Inc.*, 1999 WL 721569, at *7 (Del. Ch. Sept. 3, 1999)).

[250] *Id.*